**SO ORDERED.**

**SIGNED** this 16 day of December, 2011.

_____
**J. Rich Leonard
United States Bankruptcy Judge**
_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# WILSON DIVISION

IN RE:

L.L. MURPHREY COMPANY,                    CASE NO. 00-03213-8-JRL

    DEBTOR.                                CHAPTER 11

L.L. MURPHREY COMPANY,
LARRY BARROW, LOIS BARROW, and
DORIS MURPHREY,
                                            ADVERSARY PROCEEDING
    Plaintiffs,                           NO. 11-00139-8-JRL

        v.

D.A.N. JOINT VENTURE III, L.P.,

    Defendant.

## ORDER

    This matter came before the court on the motion for summary judgment of L.L. Murphrey Company, Larry Barrow, Lois Barrow, and Doris Murphrey (collectively "plaintiffs"). The defendant, D.A.N. Joint Venture III, L.P. ("DAN"), filed a response to plaintiffs' motion and also filed a cross motion for summary judgment against plaintiffs. A hearing was held on November 21, 2011, in Raleigh, North Carolina.

    L.L. Murphrey Company ("LLM" or "debtor") filed for relief under chapter 11 of the

Bankruptcy Code on June 8, 2000. On July 13, 2001, this court entered an order confirming the debtor's fourth amended plan of reorganization ("Plan"). The plaintiffs instituted this adversary proceeding on April 25, 2011, seeking declaratory judgment, pursuant to 28 U.S.C. § 2201, for the purpose of determining the plaintiffs' liability for the obligations specified in the Plan. DAN filed a counterclaim, asking the court to determine whether a certain herd of swine is in fact collateral for LLM's obligation to DAN.

## BACKGROUND

LLM is North Carolina corporation engaged in the swine business, with its principal place of business in Greene County, North Carolina. Larry Barlow, Lois Barlow, and Doris Murphrey (collectively "guarantors") are citizens and residents of Greene County, North Carolina and principals of LLM. When LLM filed its bankruptcy petition, LLM owed Wachovia Bank, N.A. ("Wachovia") a total of $12,790,522.36, pursuant to various notes. Wachovia also asserted claims against LLM based on two guaranty agreements signed by its principals. The guarantors had previously executed guaranty agreements to Wachovia in connection with the loans evidencing Wachovia's claim.

Pursuant to the Plan, the treatment of Wachovia's claims was divided into two notes: Note A and Note B. Note A was an amortizing note in the amount of $8,000,000.00 and called for monthly payments of $70,500.00. Note B was a cash flow note in the amount of $3,500,000.00, less any payments from certain hog sales netting more than $3,000,000.00, and provided for an excess cash flow based payment.[1] In 2003, Wachovia sold its notes and other

---

[1] "Excess Cash Flow" was defined as:
Net Income plus depreciation, amortization and other non-cash expenses, less scheduled principal payments paid under this Plan of Reorganization and less

-2-

loan documents to Cadlerock Joint Venture, L.P., and these obligations were later sold or assigned to DAN in 2008. In accordance with Note A, LLM made monthly payments to Wachovia and later to DAN. However, because the excess cash flow has been insufficient, there have been no payments made on Note B. Both notes had a maturity date of September 30, 2011. The Plan provided that following the maturity date, Note A and Note B would be recapitalized as follows:

> Following the maturity of Notes A and B, and providing that there have been no material and uncured defaults with regard to Notes A and B, Wachovia shall recapitalize the then remaining unpaid balances due upon Notes A and B (the "Recapitalized Debt"), less an amount determined on the basis of calculating Debtor's capacity to feasibly amortize indebtedness of Wachovia and Michigan Livestock Credit Corporation over a period of fifteen (15) years from maturity (the "Forgiven Debt").
>
> In calculating the amount of the Recapitalized Debt, the Debtor will determine its average cash flow ("Recapitalization Cash Flow") at eighty (80) percent of the five (5) year average net cash flow prior to maturity, after elimination of the two (2) years during such period which represents the Debtor's best and worst net cash flow years, (year 6, 7, 8, 9, and 10), consistent with the definition of Recapitalization Cash Flow as set forth in this Plan. The amount of recapitalized indebtedness shall not exceed an amount which is feasible for the reorganized debtor to pay. The Recapitalized Debt can not be less than the balance due at maturity upon Note A and may not exceed a principal amount that the reorganized debtor can feasibly service by the payment of the total monthly amount to Wachovia and MLCC of One Hundred Thousand Dollars ($100,000.00). Upon determination of the Recapitalized Debt, the reorganized debtor and Wachovia will execute additional and restated Wachovia loan documents, reasonably necessary to implement these provisions.

The Plan also provided that the obligations of the guarantors would be limited to the amount of the recapitalized debt.

It is undisputed that as of September 30, 2011, the balance due on Note A is

---

distributions to shareholders for Sub-S tax payments. Excess Cash Flow shall be determined in accordance with Generally Accepted Accounting Principles and using the Debtor's fiscal year end financial statements.

approximately $6,186,361.85, and that the Plan provides the appropriate formula for calculating the recapitalized debt.  However, there is a vast disparity in what the parties believe to be the appropriate figure for the recapitalization cash flow, which results in similarly disparate figures for the appropriate amount of recapitalized debt.  As an ancillary issue, DAN filed a counterclaim, asking the court to determine whether a certain herd of swine is in fact collateral for LLM's obligation to DAN pursuant to a U.C.C. financing statement.  The parties now move the court for summary judgment on both issues.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), made applicable in bankruptcy by Bankruptcy Rule 7056, summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## DISCUSSION

In support of its motion for summary judgment, LLM argues that the amount of recapitalized debt must be equal to the balance of Note A upon the maturity date.  LLM offered

the affidavit of a certified public accountant that has provided accounting services to LLM since 2001. In sum, this affidavit states that based on the cash flow of LLM over the previous five years and the language of the Plan, the debt associated with Note B should not be included in the recapitalized debt. In other words, because the cash flow of LLM has been so poor, when analyzed under the formula stated in the plan, the amount of recapitalized debt is the minimum allowable under the plan: "the balance due at maturity upon Note A." Therefore, LLM argues that the amount of debt remaining unpaid on Note A and Note B be recapitalized in the amount of $6,186,362.00[2] and that the liability of the Guarantors also be limited to that amount.

DAN argues that based on the amounts owed on the notes and in accordance with the language of the Plan, the amount of debt to be recapitalized is $11,095,484.08. DAN offered the affidavit of its internal accountant, which explains how this particular figure was reached. DAN's accountant admittedly incorporated hypothetical figures into her calculation of LLM's recapitalization cash flow for "demonstrative purposes," which account for the disparity between the parties in what they believe to be the appropriate amount of debt to be recapitalized.[3]

The court finds that on the issue of the amount of debt to be recapitalized, the only plausible material dispute arises from the figures provided by DAN's internal accountant, who admittedly has no factual basis for her assertions. Therefore, DAN has presented no evidence which raises a genuine issue as to any material fact, and the debt is hereby recapitalized at the

---

[2] LLM acknowledges that the Plan calls for recapitalized debt to contain market terms for the interest rate. LLM believes that appropriate interest rate is 6.0% per annum, which results in a monthly payment of $52,149.25 for a period of fifteen years.

[3] Once these conjectural figures were removed from the formula, DAN's figure was identical to that of LLM—$6,186,362.00.

-5-

amount stated in the plaintiffs' complaint—$6,186,362.00.  In regard to whether the herd of swine is in fact collateral for LLM's obligation to DAN, the court finds that because there has yet to be a default, the issue presents no justiciable controversy at this time.  In the future, if there is a default, DAN is free to raise the issue again, but so long as LLM's payments remain current, the issue is not ripe for decision.

Based on the foregoing, the defendant's motion for summary judgment is **DENIED** and plaintiffs' motion for summary judgment is **GRANTED**.

**END OF DOCUMENT**